IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

IRIS M. ROSARIO-MÉNDEZ,

Plaintiff

v.                                          CIVIL 06-1489 (JAG) (JA)

HEWLETT PACKARD CARIBE BV, et al.,

Defendants

OPINION AND ORDER
ON MOTION FOR NEW TRIAL

This matter is before the court on timely post-trial motions of Hewlett Packard Caribe filed on February 25, 2009, seeking judgment as a matter of law, new trial, seeking to alter judgment, remittitur, and the elimination of the award of punitive damages resulting from a jury verdict in favor of plaintiff in this Title VII case based upon claims of sexual harassment and hostile work environment. (Docket No. 143.)  Plaintiff filed a response in opposition to the motion for judgment as a matter of law and motions seeking other remedies on March 19, 2009.  (Docket No. 159.)  Hewlett Packard filed a reply to the response on April 22, 2009.  (Docket No. 176.)  Plaintiff then filed a sur-reply to Hewlett Packard's reply on April 23, 2009.  (Docket No. 177.)

Having considered the extensive memoranda and argument of Hewlett Packard Caribe BV, and plaintiff, the award of punitive damages is hereby vacated, and the other post-trial motions are denied.

CIVIL NO. 06-1489 (JAG) (JA)          2

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This case was tried to a jury on January 27, 28, 29, 30, and February 2 and 3, 2009.  The jury found that Hewlett Packard subjected plaintiff to a sexually hostile work environment, and that the defendant did not act promptly in reaction to plaintiff's sexual harassment complaint, and did not provide her with an effective remedy to protect her from a hostile work environment.  The jury awarded plaintiff $1,500,000.00 to adequately compensate her for the emotional pain and mental suffering caused by Hewlett Packard, and further awarded punitive damages in the amount of $500,000.00 because it found that Hewlett Packard acted with malice or reckless indifference to plaintiff's rights.  (Docket No. 127.)  The compensatory damages award was doubled in accordance with Puerto Rico Law 17, P.R. Laws Ann. tit. 29, § 155j(1).

After an amended judgment was issued to correct a clerical mistake, (Docket No. 135, dated February 11, 2009) plaintiff moved on February 13, 2009 to amend the judgment and requestadditur.  (Docket No. 142.)  On March 4, 2009, I directed the Clerk to amend the judgment.  (Docket No. 149.)  A second amended judgment was entered on March 23, 2009 awarding plaintiff one dollar in nominal damages on her Title VII claim and allocating $1,499,999 to her Puerto Rico Law 17 claim, which award was then doubled to $2,999,998.  This was done because plaintiff's commonwealth and federal claims overlap, and she therefore

CIVIL NO. 06-1489 (JAG) (JA)            3

has the right to choose to be awarded damages based on commonwealth law, which offers a more generous outcome than federal law.  Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 146 (1st Cir. 2009) (citing Doty v. Sewall, 908 F.2d 1053, 1063 (1st Cir. 1990); see Torres v. Caribbean Forms Mfr., 286 F. Supp. 2d 209, 218-19 (D.P.R. 2003). The punitive damages award remained the same.  (Docket No. 162.)

RENEWED MOTION FOR NEW TRIAL

        In reviewing the evidence on a motion for new trial, I consider the evidence in the light most favorable to the verdict.

> A verdict should only be set aside if the evidence at trial was so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it. Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002).  It has also been stated that "[o]nce a jury returns a verdict, a 'heavy burden' is placed on one who challenges it."  White v. New Hampshire Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000).  A verdict must be upheld unless the evidence presented supports only one conclusion; that the verdict cannot stand.  See Walton v. Nalco Chem. Co., 272 F.3d 13, 18 (1st Cir. 2001).  When reviewing the evidence, all inferences must be drawn in favor of the nonmoving party. Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001).
>
>         A new trial, on the other hand, should be granted and the verdict set aside if the trial judge "is of the opinion that the verdict is against the clear weight of the evidence," and that a miscarriage of justice will occur if the verdict is allowed to stand.  Sheils Title Co. v.

CIVIL NO. 06-1489 (JAG) (JA)                4

> Commonwealth Land Title Ins. Co., 184 F.3d 10, 19 (1st Cir. 1999).

Torres v. Kmart Corp., 233 F. Supp. 2d 273, 277 (D.P.R. 2002).

> If from the evidence presented at trial, fair minded persons could draw different inferences, then the matter is for the jury to resolve and judgment as a matter of law is not appropriate.  Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002).   But the non-moving party must have presented "'more than a mere scintilla' of evidence" to survive a motion for judgment as a matter of law and cannot rely on "conjecture or speculation." Katz v. City Metal Co., 87 F.3d [26,] 28 [(1st Cir. 1996)] (quoting Richmond Steel, Inc. v. P.R. Am. Ins. Co., 954 F.2d [19,] 22 [(1st Cir. 1992))].

Estate of Radamés Tejada v. Flores, 596 F. Supp. 2d 205, 217 (D.P.R. 2009) (quoting Gónzalez Pérez v. Gómez Águila, 312 F. Supp. 2d 161, 164 (D.P.R. 2004)); see Vega Santana v. Trujillo Panisse, 547 F. Supp. 2d 129, 133 (D.P.R. 2008).

## IRIS M. ROSARIO-MÉNDEZ

Plaintiff Iris M. Rosario-Méndez testified that she lives in Aguada, Puerto Rico, is divorced, has two children and works at Hewlett Packard in Aguadilla as an (electronics) operator, where she has worked in bonding, die and packaging, and other departments.  She now works in the first shift, which begins at 6:00 A.M. and ends at 2:30 P.M.  She has worked at Hewlett Packard for 12 years and 10 months.  She started as a part-timer in 1996, and became a permanent

CIVIL NO. 06-1489 (JAG) (JA)            5

employee in March 1997.  She has also been a production coordinator, and has received some of the best evaluations possible.  Plaintiff began working in the packaging department, and later worked in bonding, in "end-cap" and in "coverlayer" and was certified in each area of work.  She has worked in all five shifts and has progressed in her employment.

Ms. Rosario-Méndez was moved to the third shift (10:00 P.M. to 6:10 A.M.) in the end-cap area in September 2004, where she remained until the end of May 2005.  The end-cap area is where material was encapsulated from the flex die. Ms. Rosario-Méndez said that from the first day on the third shift she was subjected to obscene vocabulary and vulgar language throughout the shift. There was inappropriate, sexually explicit music which contained the phrase "cuckold, suck my dick" and which fostered a disrespectful atmosphere.  Co-workers would grab their private parts and women would be sitting on the laps of men.  People would make offensive gestures.  The men would grab their penises.  One would gesture to another mimicking oral sex.  There was pornography on the computers, and the employees would call each other to enjoy e-mails with bra-less women wearing G-strings, including something called the "Power of the Week." Reggaeton was played in a high volume, including a song called "La Popola" by Julio Boglio, an unpleasant song that carries a very explicit (suggestive) message. The music made a few co-workers uncomfortable, but most supported it.  As a

CIVIL NO. 06-1489 (JAG) (JA)            6

woman, plaintiff was offended at the lack of respect.  All of this occurred from the

first day she arrived at the third shift.  Ms. Rosario-Méndez felt she had no options

because she had to operate her machine and could not leave her work area.  She

felt very badly and was embarrassed.  She became depressed due to the offensive

gestures and had continuing nightmares.  Sometimes she went home because she

did not feel up to being in the area.

Ms. Rosario-Méndez' supervisor was José Matías, who was rarely present.

He would show up 10% of the time.  She reported the vulgarity and music to this

supervisor in September 2004.  (In March 2005, she reported the issue in writing

to the Hewlett Packard production manager.)  Ms. Rosario-Méndez told José

Matías of inappropriate comments in the workplace and that she was being made

to feel uncomfortable.  She asked him to talk to the personnel, but when he asked

her to give him names she said that she could not.

Ms. Rosario-Méndez noted that Hewlett Packard had a policy against sexual

harassment and that she has been aware of such a policy since she started

working there.  She may have received a copy of Hewlett Packard's sexual

harassment policy and knew that an employee could complain to a supervisor or

a person of her trust.  She also knew there was an open door policy, that she

could speak at any time, and that Hewlett Packard promoted the open door policy.

New employees received the training, and once a year there was required training

CIVIL NO. 06-1489 (JAG) (JA)                 7

through the computer system.  The sexual harassment policy is available 24 hours a day.  Iris Rosario-Méndez is aware that there is a process at Hewlett Packard to make complaints and that by complaining to José Matías she followed the policy.  She said that he did nothing to address her complaint, although she knows that the Hewlett Packard supervisor is supposed to conduct an investigation under such circumstances.   In March 2005, plaintiff repeated the complaint to Human Resources.  Before that time, an employee by the name of Miguel Rosario had harassed her at least four times.  Aside from being an operator, Miguel Rosario is the right hand man of supervisor José Matías.  The first specific incident with Miguel Rosario was a week after plaintiff had arrived at the third shift.  He asked her why she had left her mate since with such a horny face, she had to be very hot in bed.  Nobody else witnessed this statement, which was made while she was working.  Upon hearing this, she felt like crying due to the lack of respect.  She felt like leaving the factory and not returning.  She continued working, and remained friendly with co-workers.  She did not complain at that moment.  She was ashamed to comment on the incident because she felt the consequences of a sexual harassment claim can be serious, and Miguel Rosario and José Matías were friends.  After this first incident, while she felt anger, she calmed down.

José Matías, as a coordinator, supervised plaintiff's shift and had the authority to assign work and resolve issues, but she did not trust him.  He had

CIVIL NO. 06-1489 (JAG) (JA)               8

persons who would keep him informed as to what happened on the shift.  If there was a staff meeting, he would be there and then leave.  He would then return from 4:30 A.M. to 5:00 A.M. if he showed up at all.  The second incident with Miguel Rosario occurred when plaintiff was looking for materials.  Miguel Rosario approached her, and making reference to a co-worker, Cliff, Miguel Rosario told plaintiff that she "lucked out because that black man has the dick of a horse". This occurred in November 2004.  Plaintiff gestured a "no" to Miguel Rosario and called him stupid and kept walking.  She felt bad and did not want to be there. She got to her work area and began crying.  Nobody had noticed.  Nobody else was present during the incident.  She continued working and did not want anyone to notice because of the shame she felt.  José Matías was not present in the work area.  She calmed down and did not tell Hewlett Packard management about the incident.

The third incident occurred in February 2005 when Miguel Rosario approached Manuel Quiñones and asked him if he wouldn't want to have sex at that hour ("tirarse un polvo a esa hora").  Manuel Quiñones told him he would not answer that question, and said that plaintiff did not kid around that way, and he did not want to be "in personnel".  Miguel Rosario said that there was no problem and that everything was under control.  Miguel Rosario put his hand on the back of plaintiff's chair and told plaintiff, "wouldn't you have some sex now?" and

CIVIL NO. 06-1489 (JAG) (JA)                9

plaintiff responded that he should ask his mother, that "maybe your mother would like to have sex with you."  Miguel Rosario then put his head down and left. Plaintiff did not report this incident at that time.  She remained in the area and cried and felt the world coming down on her.  She felt helpless, having no trust in her supervisor, and felt that nothing would be done since Miguel Rosario was the favorite of José Matías.  She did not notify Hewlett Packard.

The fourth incident occurred on March 18, 2005 when Miguel Rosario was horse playing with Pablo López, and jumped on him, and told him a bad joke. Plaintiff told Pablo López not to kid around.  Plaintiff had moved to Pablo Cruz' machine and Miguel Rosario told her not to be a busy body, that this had nothing to do with her. Plaintiff told Miguel Rosario that she was not talking to him.  Then, with no witness present, Miguel Rosario folded his work robe in the shape of a penis and offered it to plaintiff who started crying.  Again she felt the world had caved in.  She broke down and "felt like the worst bitch in the world."  This occurred on a Friday and she would be returning to work on Sunday.  She could not find a supervisor until March 23.  The supervisor at that time was Ricardo Rosa, as José Matías had moved to a project.  Plaintiff told Mr. Rosa about the incident of the week before.  She also told him about the previous incidents since she did not have the trust of José Matías because she had asked for a meeting to be held and he had done nothing.  Ricardo Rosa said he would talk to the

CIVIL NO. 06-1489 (JAG) (JA)            10

appropriate persons and she would be notified of what action was to be taken. Human Resources then conducted interviews of employees one and a half months after she reported the incidents.

On April 28, 2005, Fernando Pérez, manager of production, announced that there were abnormalities in the third shift and he talked at a meeting about these abnormalities, rumors of sexual harassment in the work area, and inappropriate language and music.  The third shift personnel were all there, Miguel Rosario, José Matías included.  Upon inquiry from Fernando Pérez, plaintiff raised her hand and said that there was inappropriate music and vulgar language in her area.  She felt like breaking down and crying and could not say anything else.  He announced that there would be an investigation.  That meeting lasted about an hour and a half.

At the beginning of May, 2005, Fernando Pérez asked her to his office so she would tell him who the harasser was.  On May 5, she was interviewed by Ángel López, the manager for Human Resources.  He took notes during the interview. (Joint Exhibit 1.)  Plaintiff told Ángel López about the penis incident and that since September 2004, she had not interacted with co-workers.  She also told him about the co-workers imitating oral sex.  She mentioned the "devil music."  She did not tell Ángel López that José Matías had knowledge of the incidents.  José Matías was sending people to Human Resources as part of the investigation.

CIVIL NO. 06-1489 (JAG) (JA)                11

Plaintiff had told José Matías that Manuel Quiñones had been present at an incident but Quiñones was not summoned.   Ángel López interviewed almost everyone from the end-cap section except for Mr. Quiñones and Alexander Vega. The result of the investigation was that there was no proof of sexual harassment but that the music in the area was not appropriate.

Ángel López told plaintiff that Miguel Rosario would be disciplined.  He was made ineligible for stock options, educational benefits, 401K, etc.  During her interview with Ángel López, plaintiff described the music, the sexual gestures, reference to the male genitalia, pushing heads in a suggestive way, practically everything.   Ángel López said he did not like Miguel Rosario and that the investigation pointed to him, but that nothing could be done.  He said that either plaintiff or Miguel Rosario would go to the first shift and recommended that plaintiff go to the first shift since it was more convenient for her to do so.  She accepted the recommendation because after reporting the matter, the third shift would hold it against her.  Miguel Rosario remained in the same shift and was given overtime as well.  Thus, in late May or early June, 2005, she began working in the first shift in coverlayer, from 6:00 A.M. to 2:30 P.M.  Ángel López said that she would not encounter Miguel Rosario there, and that when she returned to the third shift in October 2005, none of the current workers would be there because they would all have accepted a voluntary separation incentive (VSI) offered by the

CIVIL NO. 06-1489 (JAG) (JA)          12

company.  However, Miguel Rosario would leave the third shift at 6:30 P.M. or 6:40 P.M., and not at 6:10 P.M., so that his presence would overlap with plaintiff's.  No other remedy was given when the investigation was over.

Plaintiff began the first shift in the gowning area, a clean room where there was a dress protocol, including head cover, body suit and shoe covers.  Miguel Rosario would be leaving as plaintiff was coming in.  He bumped into her once. Another time she went to end-cap to pick up some empty reels and Miguel Rosario was there in the area and pushed her.  Plaintiff felt that Hewlett Packard had not done anything.  Miguel Rosario could leave when he pleased.  She saw him during her shift constantly after he was transferred.   When plaintiff reported this to Fernando Pérez, he said that it was impossible.  He would see if Miguel Rosario was overstaying his shift.  She had reported the two incidents of pushing to Fernando Pérez in June 2005, and had told him she did not want to see Miguel Rosario.  Nobody else saw either incident.  Fernando Pérez told her if it happened again, she was to yell, and that Miguel Rosario was not supposed to remain in the work area after his shift ended and hers began.

Plaintiff saw Miguel Rosario many times on the first shift, from ten to twenty times.  She felt bad and wanted to leave since Miguel Rosario had offended her as a woman.  She began to come into work early in order to avoid him in the

CIVIL NO. 06-1489 (JAG) (JA)          13

gowning room.  She began closing herself off in the work area.  She did not want to face him and asked co-workers to get her materials for her.

In July 2005, plaintiff reported to the nurse's office.  The nurse then recommended that plaintiff  make an appointment with San Juan Capestrano, a hospital dedicated to mental health.  She felt hemmed in, had constant headaches, and did not want to live.  She locked herself in her room at home. She distanced herself from the world she knew and felt bad.  She felt that Human Resources had done absolutely nothing when she had reported the sexual harassment.  She received ten days of outpatient treatment at San Juan Capestrano and was medicated to improve the situation, to control her anxiety and the depression she was living in.  She returned to work in August 2005 although at the time of trial she was still seeing a psychiatrist, Dr. Armando Caro. She said she was not medicated during the trial process, but  still took medicine for anxiety, and understood that she had not recovered 100%, that she is not where she should be.  At the slightest disturbance, she would begin to cry.  She felt incompetent and powerless, and clashed with co-workers.  She had a hard time sharing with people.  When she returned to work in August 2005, Miguel Rosario was still performing overtime into the first shift.  She reported this to Cruz Andino, the first shift supervisor and had talked to Cruz Andino before she went to San Juan Capestrano.  She had told him that Miguel Rosario was in the first

CIVIL NO. 06-1489 (JAG) (JA)            14

shift and that she felt corralled "at work or going to jail" by Miguel Rosario's presence in the workplace.  She was deprived of the tranquility of leaving the work area.  Cruz Andino first said he would talk to the manager but later told her that he could not do anything.  She began to cry and felt like an elephant was sitting on her chest.  When she returned everyone knew she had been to the San Juan Capestrano Hospital.  She emphasized that Hewlett Packard had done nothing.  Miguel Rosario's overtime ended at the end of August 2005.

In October 2005, plaintiff was moved back to to the third shift.  The third shift personnel had gone to work for Selectica, a contractor, so that she still worked with the people she had reported because they continued to physically work at Hewlett Packard.  Those co-workers would hide her tools.  Groups of co-workers, including two females in particular, would laugh when they saw her.  Plaintiff would constantly avoid the work area.  She complained to Blanca Cruz, the third shift supervisor, about being transferred to that shift.  Plaintiff did not mention names, however, and Blanca Cruz did nothing.

On November 4, 2005, plaintiff sent a letter to Hewlett Packard, (Exhibit M), complaining that when she reported the sexual harassment of Miguel Rosario while on the third shift, she was sent to the first shift, although he was allowed to work overtime in her new shift, thus allowing the environment to continue.  Having again been transferred to the third shift, she noted that Miguel Rosario

CIVIL NO. 06-1489 (JAG) (JA)          15

would be working in the first shift.  She then asked that he be transferred to another shift where he would have no contact with her, saying that she wanted to stay in the first shift.  She received a reply from Hewlett Packard dated November 8, 2005, signed by David Trabar of Human Resources saying they would investigate the situation.  (Exhibit N.)  By then Miguel Rosario had opted to become a Selectica employee pursuant to the voluntary separation incentive, but the machinery Selectica used was located on the Hewlett Packard premises, so Rosario remained working there.  While the offensive "perreo" music about which she had complained in the third shift had been banned, it nevertheless continued and there was again no supervision.  She again saw Miguel Rosario at a meeting in July 2006 where Selectica employees were gathered.  She felt very badly.  She reported to a supervisor, Arturo Medina, that Miguel Rosario was a sexual harasser.  He said that he had no knowledge of that.  She had seen Miguel Rosario between 8 to 10 times from the time he went to Selectica until the July 2006 meeting.  He would look at her.  She would see him in the cafeteria.  Her depression got worse.

Plaintiff said she would lock herself in her room at home and avoid socializing with her family members, who would ask why she did so.  She also stopped socializing with her co-workers.  She communicated the necessary and the minimum information.  She would cry on the way to work, or would simply not

CIVIL NO. 06-1489 (JAG) (JA)           16

go to work for a couple of days.  Her youngest child would ask her why she did not come out with them and why she locked herself in her room.  She would break down and feel smothered.  Her 14 year old daughter would take control of the household.  Plaintiff would think of ways to deprive herself of her life and had thought that if she killed herself, the nightmare would stop.  She thought that the company did not exist and that Hewlett Packard did nothing.

At trial, plaintiff discussed the two instances of Miguel Rosario's grazing against her shoulders.  She said that he pushed her upon bumping against her, and grazed her shoulder with his arm, although the word push was not mentioned in her deposition.  The word "push" was used for first time during trial.  Apart from seeing Miguel Rosario again, plaintiff did not have any more incidents.  She saw Miguel Rosario at a meeting of Hewlett Packard and Selectica in June or July 2006, and she saw him several times while she was having breakfast at the Hewlett Packard cafeteria.  She saw him five to seven times between November and December 2005.  In 2006, she saw him once in the parking lot, once at the meeting and once at the cafeteria.  Plaintiff saw Miguel Rosario 10, 15, or 20 times during the first shift while she worked in the cover layer area and Miguel Rosario worked in end-cap area.  She testified at trial that she could tell when he was working in end-cap while she worked in cover layer area.  In her deposition,

CIVIL NO. 06-1489 (JAG) (JA)                    17

however, she stated that when in the cover layer area, she was unable to ascertain whether he was outside or not.

At the end of her shift, she would go from the work area to the gowning area and then leave.   The third shift ended at 6:10 A.M.   She would find employees leaving the third shift, and if the third shift employees stayed longer or worked overtime, she would not see them in the gowning area.   If Miguel Rosario worked overtime, this reduced the chances of running into him at the gowning area.   She complained about seeing him but the supervisors said that nothing could be done.   She testified that she did not tell Ángel López about the two bumping incidents or about seeing Miguel Rosario.   She recalled sharing an avocado with Ángel López during lunch in 2005, around the time when she was treated at San Juan Capestrano Hospital, after the two incidents of grazing, and after she had seen Miguel Rosario performing overtime during her shift.   At that lunch, however, she and López were seated at a four-person table, and it was full. She did not remember the persons there, but their presence inhibited her from telling López about the incidents.

Ángel López asked her if she had had any problem with Hewlett Packard's response, and she did not identify any.   She also did not seek any appointment with Ángel López to discuss the bumps by Rosario.

CIVIL NO. 06-1489 (JAG) (JA)          18

About seven or eight persons worked on the first shift at the cover layer area.  While they were in the gowning area, other employees were reporting for work at the bonding and end-cap areas so the gowning area was crowded, and it was worse because the third shift employees were also leaving

In a communication dated November 4, 2005, plaintiff complained because while she was in the third shift, Miguel Rosario was assigned to the first shift.  She knew he was not an employee of Hewlett Packard.  She requested from Hewlett Packard to transfer him to the third shift or to another shift in which he would have no contact with her.

Plaintiff related being out of work for about 10 days in July-August 2005. On many occasions, she would arrive at the parking lot but find herself unable to get out of her car.  She would simply turn back home.  She had never had attendance problems at Hewlett Packard previously, nor had she received any attendance advisory, although she requested leave when she went to San Juan Capestrano.  Her performance was not affected by the incidents related to this case.  Her performance evaluations before going to San Juan Capestrano were excellent both prior to and subsequent to her treatment at San Juan Capestrano. She continued to receive salary raises and the highest rankings within the Hewlett Packard system.

CIVIL NO. 06-1489 (JAG) (JA)          19

At trial, plaintiff recognized Hewlett Packard's sexual harassment policy, the revised version of 1998, and was aware of the policy.  (Exhibit A.)  She knew that the Human Resources Policy was that the policy was available to everyone that works at Hewlett Packard.  The employee was responsible for reading the global policies of Hewlett Packard on its website.  The company offers all Hewlett Packard employees the opportunity to discuss any doubt they may have in relation to any policies.  (Exhibit B.)  Plaintiff was familiar with Hewlett Packard's commitment to a harassment- free environment, effective April 2003, as well as with the updated version of Hewlett Packard harassment free environment policy, dated July 25, 2006.  (Exhibit C.)

After her November 4, 2005 complaint in relation to the transfer of Miguel Rosario to the first shift, Miguel Rosario's employer transferred him to the Selectica building, which is next to the Hewlett Packard facilities.  Hewlett Packard has several buildings, but Selectica has its own distinct facility.

José Matías asked her if Manuel Quiñones had done anything to her and she said no.  This exchange occurred after the first incident with Miguel Rosario.  She had asked José Matías to hold a meeting in relation to sexual harassment since the conduct was not appropriate, and because of the lack of respect to fellow workers.  She told him someone had offended her, and had been disrespectful to her.  When asked what remedy was given to her by Ángel López, plaintiff said that

CIVIL NO. 06-1489 (JAG) (JA)          20

López moved her to the first shift, and Miguel Rosario remained in the third shift and was given overtime.[1]

## ÁNGEL MANUEL LÓPEZ SÁNCHEZ

Ángel Manuel López Sánchez testified that he lives in Hatillo, Puerto Rico and has been retired from Hewlett Packard in Aguadilla for the last three years. Mr. López was the employee-relations manager within the company, and part of Human Resources. He held that position for four or five years, from about 2001 to February 2006, when he retired. Mr. López holds an M.A. in business administration and supervision, and a B.B.A., with 12 credits in international finance. He worked a total of 17 years with Hewlett Packard. He related Hewlett Packard's having a policy against sexual harassment and described it in general terms: the policy prohibits an atmosphere of sexual harassment or discrimination. The employee has a way to complain, and when an employee complains or files a complaint of harassment within the workplace, the employee can use the open door policy that Hewlett Packard has. Open doors means that any employee who has any type of complaint can go to the supervisor, to the next management level, to human resources, including the director, to the plant manager, or to the CEO of the company. If a supervisor or manager receives a complaint about

_____

[1]Plaintiff was impeached on a number of occasions, more than 10 of which were emphasized to the jury during closing argument when defense counsel emphasized to the jury that plaintiff was a liar.

CIVIL NO. 06-1489 (JAG) (JA)          21

sexual harassment in relation to a situation which he considers offensive or improper, he will listen to the complaint and then refer the case to human resources.  If any complaint is made by an employee in relation to another employee, notification must be made to human resources.  If the complaint relates to co-workers, one must speak to human resources.  If the matter is related to the work environment, the manager may take the pertinent action since he knows all the people within the group, and he may take any action he may deem necessary.  Supervisors and managers receive training during the year, but in the last years, the entire management personnel, supervisors and managers, would receive a seminar on sexual harassment in the workplace.  They are told about the law, what sexual harassment is, and any changes in the laws related to sexual harassment.  In general terms, everything related to sexual harassment policy, including how to respond when they receive a complaint from an employee, was the subject of the training.  Employees are aware of the sexual harassment policy from the first day, and the policy is among the information given to them.  It is also posted throughout the company premises:  in the cafeteria, lobby, and areas where employees might gather so that it be accessible to the employees in the hallways of the working areas.  Joint Exhibit III is the policy concerning a sexual harassment-free working environment dated April 2003.  It protects shareholders, employees, clients, or anyone affiliated with

CIVIL NO. 06-1489 (JAG) (JA)            22

Hewlett Packard potentially affected by sexual harassment.  It describes work environment harassment as a form of discrimination, and states that it can take many forms.  It also mentions the legal liability for sexual harassment and Hewlett Packard's responsibility for non-employee actions.  It provides that management will thoroughly and promptly investigate every reported incident of harassment. It will conduct a complete investigation concerning what happened as soon as possible.  The policy provides no specific timetable for management action.  If López can begin the investigation on the very same day, however, he does.  There is also protection from retaliation, when a complaint for harassment is substantiated.

Ángel López stated that plaintiff was a co-worker in Hewlett Packard, an operator in production, and that there were no problems with her performance. Prior to when she spoke to him, she had not complained to anyone else about sexual harassment in the workplace to his knowledge.  Mr. López heard about some troubling situations when he met with her but did not recall at trial if any supervisor had told him about such situations.  Otherwise, he had no independent knowledge of any situation involving harassment, noting that this had occurred four years ago.  He stated that plaintiff called him on the phone, and wanted to talk to him about a situation.  He told her she needed to meet with him personally.  They met in a private room in the lobby used precisely to interview

CIVIL NO. 06-1489 (JAG) (JA)          23

employees.   She talked about a situation in the workplace involving lack of respect, vulgar language, and music suggestive of sex.  That conduct is prohibited by the harassment-free work environment.  She had a specific situation with Miguel Rosario.  She explained that on one occasion, he and another employee were arguing, that she involved herself in the argument, and that Miguel Rosario told her she was a busy body.  She also told Ángel López that Miguel Rosario had a robe used in the workplace that he used to form the shape of a penis, moving his hands up and down in a cupped fashion.   He considered this as an inappropriate gesture, like when one is upset, but done within the discussion they were having.

Plaintiff told López that she and Rosario did not get along well generally. She also said that he knew of the hostile environment.  She said that the area manager, Fernando Pérez, had met with the group and had talked about the policy of the sexual harassment.

Later, Mr. López reviewed the employee records of Miguel Rosario and verified that there were no warnings in his file in relation to this type of complaint. Mr. López made extensive use of his handwritten notes (Joint Exhibit I) during his testimony.  In one part of the notation, it reads: "no echarías un polvito a esta hora," which translates into:  "You wouldn't have a little sex at this time?"  Plaintiff related that this comment was made not specifically to her, but that she heard it

CIVIL NO. 06-1489 (JAG) (JA)          24

made generally within her work environment.  Mr. López stated that he did not necessarily write down everything she told him, but rather just the important parts.  Plaintiff told him that Miguel Rosario has a good relationship with Ricardo Rosas, another supervisor, and that her supervisor José (Tony) Matías, had knowledge of what was happening in the area.  She told Mr. López that she had spoken about the situation and about the behavior of the group with José Matías, but she did not tell Mr. López how Matías responded.  José Matías never told Mr. López about any situation in relation to plaintiff.  Plaintiff had told Mr. López that  Alexander Vega had told Fernando Pérez about the situation and that Mr. Pérez had had a meeting with plaintiff's co-workers to talk to them about the harassment-free policy, and that the situation was calming down by then.

Mr. López made a notation stating the order of potential witnesses to the situations plaintiff had complained of, listing Pablo López (who had knowledge of sarcastic remarks of José Diez), Deborah Montiel, Raúl de Thomas, (Angelie Nieves did not come), Alex Morales, Alexander Vega, José Guzmán, Rene Ramos (friend of Miguel Rosario and José Matías), José Diez, Keyla Ponce, and Xiomara González.  Mr. López interviewed all of them except for Manuel Quiñones.  On one occasion, plaintiff asked López to interview Manuel Quiñones.  López said Quinones was not in that night and that Mr. López would call him.  The name Gilberto (Feliciano) appears in the notes.  He had been there for six months.

CIVIL NO. 06-1489 (JAG) (JA)          25

While working in the end-cap department, he heard comments like "I had sex after I left."  Plaintiff was said to have said "This" (gesturing toward her genitalia) "is the one that is going to run the machine."  Continuing to refer to his notes, Mr. López said Manuel takes a long time on breaks.  The notes also stated that the music was vulgar, that José Diez brought the music, that the group isolated Iris, and that Pablo López was uncomfortable because he was always being changed from machine to machine.  He heard that Miguel once said "that cunt face did not select the VSI."  Another notation identified a suggestion to rotate the role of coordinator.  López' notes also point out that someone said that Iris was a busy body and that Gilberto Feliciano said the music was vulgar and had sexual connotations.  Feliciano also claimed that Iris had once grabbed her genitals.  López did not know of any personal relationship between plaintiff and Gilberto Feliciano.

Mr. López made the evaluation of everything and corroborated the information, and that there was an offensive environment, such as the music connoting sex.  Mr. López met with plaintiff later but did not tell her anything of what the co-workers said about her.  In López' notes, there is a notation relating to an interview with Pablo López dated May 9, 2005.  The notes read:  "He feels comfortable; he lacks due respect; he has heard vulgar and obscene words, many songs of sexual connotation are heard.  It has lessened or toned down since

CIVIL NO. 06-1489 (JAG) (JA)              26

Fernando Pérez arrived."  Gilberto Feliciano confirms that co-workers  lower their heads simulating oral sex.  He understands there is a personal situation between Miguel Rosario and Iris.  Tony Matías told Miguel Rosario to perform his shift and "do the pass down," that is, to notify the person taking over of any problems in the shift and of any remedial actions taken in response.  López determined that the position of coordinator should be rotated every six months, but it is only for Miguel Rosario and Tony.  He also determined that the harassment  "should be cut off now," and that Miguel Rosario and Iris should be separated.  He beleived that the supervisor should be more attentive and the regulations followed.

    Raúl de Thomas was interviewed on May 9, 2005.  López' notation reads that music is not appropriate; that there is vulgar and obscene language; and that favoritism exists.  Since February, the  harmony had broken down. De Thomas indicated that he would like for employees to be made aware of the norms and the rules.  He felt that respect for the rules had been lost.  He wanted to see that respect exists.  De Thomas believed that the supervisors knew of the situation and had taken no action until two weeks before.  Mr. López conducted other interviews on May 9, 2005. Alex Morales said there was obscene language, music insinuating sex, and little attention to norms and rules.  There had been change slowly occurring after meeting with Fernando Pérez.  Morales stated that the sooner the situation was resolved, the better.

CIVIL NO. 06-1489 (JAG) (JA)          27

        Keyla Ponce was interviewed on the same day.  She is the daughter of Maribel and Carlos Zambrana, and has been in the end-cap group for a short time. She learned that there had been hostile encounters in the group when Fernando Pérez arrived to speak to the group.  She had heard rumors but had not seen any incidents.  López' notes as to John Guzmán state that he said there was vulgar music and obscene language.  He observed that the coordinator was not rotated, that the supervisor had not taken any remedial action, that the end-cap area consisted mostly of men.  The notes as to José Diez state that he would bring the music but that he stopped doing that.  There was obscene language spoken by both males and females.  He had known Iris for nine years.  On the next page of Mr. López' notes, there is a name, Xiomara, and the notation:  "has rubbed intimate parts, has a way of being."  He does not know whom she is referring to. On the next page is Manuel Quiñones, whom he interviewed over the phone since he was not working on the night Mr. López conducted his interviews.  Quiñones indicated that his area of work is in a far corner and he does not have many opportunities to talk to coworkers.  He stated that Miguel Rosario was coordinator and had no problems with anyone.  He did not remember that Miguel Rosario had made comments regarding sex.  He did not want to have problems with anyone. When Mr. López asked about vulgar language, Manuel Quiñones had nothing to say except that Rosario gets along with everybody and that the group works as

CIVIL NO. 06-1489 (JAG) (JA)          28

a team.  Everybody was talking about the same thing and that there was no supervision.

Of those employees that were interviewed, two of the nine had negative comments about plaintiff.  Miguel Rosario said that he has not said anything verbal and denied any argument with plaintiff.  He asserted that nothing had happened.  Mr. López asked Miguel Rosario about the obscene music and vulgar language and he said that music was listened to, but that it was not vulgar.  Mr. López' impression was that he was not saying all that he knew.  Mr. López reached this conclusion because having interviewed seven or eight people before him, he knew that music of sexual connotation was heard and that the language used in the work area was offensive and not appropriate.  Thus, Mr. López thought Rosario was not telling him all the truth.

Generally, once Mr. López has all the evidence about a situation he is investigating, he then evaluates what measures can be taken immediately.  His conclusions in this case were that what plaintiff said about the music was correct, and that there was obscene, inappropriate language which violated the harassment-free environment policy.  In relation to the specific complaint about Miguel Rosario, based upon what he had learned, it was possible that it may have occurred.  He believed plaintiff.  Mr. López contacted the area manager, and explained to him two things:  the music has to be removed immediately, and since

CIVIL NO. 06-1489 (JAG) (JA)                29

he, Fernando Pérez, had talked to the group in relation to speaking obscenely, that he be on the lookout for anything.  Mr. López did not believe that he told him anything about plaintiff's complaint about Miguel Rosario.   In relation to disciplinary action, José Diez admitted he was the one that brought the music. No disciplinary action was taken as to him.   No disciplinary action was taken against José Matías, although he knew of the music, the language and the gestures, and was almost never present.

     The notes repeated the theme that the supervisor had done nothing, should be more attentive, knew the situation and took no action until two weeks before topic was touched on lightly.

     Ángel López told Iris Rosario-Méndez that he had interviewed all pertinent co-workers except two, and plaintiff said she wanted him to interview Manuel Quiñones.  At that time, there had not yet been a conclusion to the investigation. Subsequently, López contacted plaintiff and told her he had spoken to Manuel Quiñones and that a disciplinary decision would be made.  He did not notify her of the decision at that time, but  he did tell her when the decision was later made to discipline Miguel Rosario.  López prepared a written warning to Miguel Rosario that was dated May 26, 2005.  (See Joint Exhibit IV.)  Fernando Pérez was one of the signers of the letter.  The disciplinary results in relation to Miguel Rosario were that he became ineligible for pay increases, job transfers, promotions, stock

CIVIL NO. 06-1489 (JAG) (JA)          30

incentives, and educational benefits for a period of six months.  Mr. López noted in the letter that disciplinary policy could include firing.   No harsher action was taken, however, after considering all of the factors, including the fact that the whole shift of employees would talk offensively, including, allegedly, plaintiff. While López believed plaintiff, he also considered the fact that Miguel Rosario had accepted the voluntary separation incentive, which was helpful to the company in light of the fact that it had to dismiss 600 employees.

Mr. López had never had a complaint about plaintiff.  He considered her a team player, and a great employee.  He told her that Miguel Rosario would be disciplined and that she would be changing shifts.   Thus, the remedy was to transfer her to the first shift.  He asked her if this could be done, and she said that she could be changed in shift.  Therefore, he told her she would have a shift change.  She started on the first shift so that she would not have to work with Miguel Rosario.  She agreed to the shift change.  Had Mr. López changed Miguel Rosario to the first shift, he would be rewarding him, as a lot of people wanted to be in the first shift.  The change was not going to be permanent and would last only until Miguel Rosario would have left the company as he had requested.  The change was immediate.  Mr. López had spoken with Fernando Pérez so that it would be done.  Mr. López did not have any knowledge that Miguel Rosario performed overtime into plaintiff's shift.

CIVIL NO. 06-1489 (JAG) (JA)            31

Selectica was contracted by Hewlett-Packard to make cartridges at a place other than on the grounds of Hewlett-Packard.   It had a plant next door. Sometimes, the Selectica employees had to come to the Hewlett Packard plant.

Mr. López stated that part of the remedy was that Fernando Pérez had met with the group.  Plaintiff had suggested action because she was very upset and could not work with Miguel Rosario.  She was given the option.  Hewlett Packard was going to move Miguel Rosario but it was her option to move to the first shift, and she was in agreement with the move.

Mr. López noted that no witnesses related the incident of the robe to him, and that nobody saw anything regarding the incident.  There were no witnesses to the incidents.  Nevertheless, Mr. López decided to take remedial measure:  by changing Iris Rosario-Méndez' shift and by disciplining Miguel Rosario.

Mr. López made reference to Joint Exhibit II, a letter dated May 27, 2005 that he wrote to plaintiff.  It is a summary of the investigation made by Mr. López. When he finishes an investigation, he creates such a compilation and sets forth what has been decided.  This is communicated in writing so that there is a record of it for the employee, Iris Rosario-Méndez in this case.  It includes the actions that are to be taken and the action that was already taken and states that she could come to him if his instructions are not followed.  It states that no reprisals were to be taken towards her or anyone else, and that if any were taken, she was

CIVIL NO. 06-1489 (JAG) (JA)            32

to notify him so that he could take action.   Joint Exhibit II confirms the conversation with Iris Rosario-Méndez regarding the investigation summary.  Mr. López noted his appreciation to plaintiff in that she brought this to their attention, and asked her to report if there were any reprisals taken.

On May 24, 2005, Mr. López sent plaintiff an e-mail (Exhibit D), regarding a meeting he wanted to have with her.  He also sent her a subsequent e-mail regarding the meeting.  (Exhibit E.)  They met on May 26 at his office and he discussed the results of the investigation with her.   Joint Exhibit IV is a misconduct advisory letter dated May 26, 2005 to Miguel Rosario, where the disciplinary action is explained in detail.  It states that the action, including deprivation of pay increases, educational assistance, and stock incentive programs, would be effective for six months, at which time he would be leaving the company.  He was told that he must stop the behavior immediately.

Mr. López said that if Miguel Rosario was again involved in misconduct, he would be terminated and would not get the voluntary separation incentive package.

DR. FERNANDO JAVIER PÉREZ MUÑOZ

Dr. Fernando Javier Pérez Muñoz testified that he is an Assistant Professor at the University of Puerto Rico Mayagüez campus.   He holds a B.S. in Engineering, an M.A. in electrical engineering, and a Ph.D. in Agricultural

CIVIL NO. 06-1489 (JAG) (JA)             33

Engineering.  Dr. Pérez worked for Selectica and for Hewlett Packard prior to that. He worked part-time for Hewlett Packard beginning in November 2000 and became full-time in January 2001.  He stopped working for Hewlett Packard on October 31, 2005, and began working for Selectica on November 1, 2005.  While at Hewlett Packard, he was production manager of the intermediate assembly area.  His duties were yields, quality, supervising area shift supervisors, and looking for cost reduction opportunities.  There were eight supervisors under his direction.   Mr. Pérez knows the third shift supervisor, José Matías, of the intermediate assembly department.

Dr. Pérez explained the four areas of production:  sew, cover layer area, bonding, and end-cap.  José Matías was a supervisor for the operators.  Ricardo Rosas was the supervisor for the fifth-shift, which is from 10:00 A.M. to 10:00 P.M. on Saturday and Sunday, in same area.

When Dr. Pérez joined Hewlett Packard, the intermediate assembly supervisors were already assigned to their shifts.  There was an offsite meeting where it was decided to make some improvements and restructure the area.  The supervisors decided that they would always supervise the same shift.

Dr. Pérez knew Iris Rosario-Méndez as an operator at intermediate assembly who worked in the third shift, meaning that José Matías was her

CIVIL NO. 06-1489 (JAG) (JA)          34

supervisor.   He was not aware if Ricardo Rosas ever supervised Iris Rosario-Méndez.

Dr. Pérez noted that Hewlett Packard has a policy against sexual harassment, and standards of business conduct.  Every year there was training and sexual harassment as part of the policy.  If someone is not comfortable going to the supervisor or manager, he can go directly to Human Resources.

In October or November 2004, there were no complaints.  He did not remember if there were any cases of sexual harassment.  He recalled having a meeting with the third shift.  Meetings were not something on a fixed schedule, and were had whenever he felt like they needed a meeting.  However, an employee did complain about sexual harassment.  He received a report on the end-cap area third shift.  Two employees in the end-cap area were involved: Iris Rosario-Méndez and Miguel Rosario.  There was a complaint about objectionable loud reggaeton music and unwelcome comments.  Dr. Pérez went to Ángel López expressing his concern but did nothing more.  Mr. López told him that he would investigate further, that he would take care of it and that Dr. Pérez should not get involved.   Dr. Pérez assumed Ángel López made the investigation.  Dr. López handed a warning to Miguel Rosario and told him the result of the investigation. (See Joint Exhibit IV.)  Ángel López suggested moving either Miguel Rosario or Iris Rosario-Méndez and gave plaintiff the choice of whom to move.  She was moved

CIVIL 06-1489 (JAG) (JA)                     35

before the end of the investigation.  Hewlett Packard needed increased production in end-cap in 2.X, specific machines.  Miguel Rosario was the only one qualified to work on such machines.  Management discussed strategies and the supervisors assigned Rosario to work overtime on the machines.  Dr. Pérez was part of the decision to do so.  Plaintiff remained in an area separate from Rosario.  He knows she was in a different shift to separate them but he allowed Miguel Rosario to perform overtime that spilled over into plaintiff's shift.  He did not remember if Iris Rosario-Méndez complained to him.

Dr. Pérez explained that Iris Rosario-Méndez was assigned to end-cap in the third shift and cover layer in the first shift.  Hewlett Packard had announced a workforce reduction, and many intermediate employees had decided to take the voluntary separation incentive and they prepared the area, designed or devised a cross-training strategy so that there were resources to keep the production going.  They therefore moved Iris Rosario-Méndez to the cover layer area to be ready when needed.  She received the training and was certified.  While he had different conversations with Iris Rosario-Méndez about many subjects, he had none about her and Miguel Rosario.  He did, however, request that the music be turned off at end-cap.  There were no more complaints after that about the music.

RICARDO ROSAS MARTE

Ricardo Rosas Marte testified that he is a calibrations expert in the Puerto Rico Aqueduct and Sewer Authority, and has worked there for one and a half

CIVIL 06-1489 (JAG) (JA)                    36

years.  He studied computer engineering at University of Puerto Rico, Mayagüez campus and received a B.S. in 1990.  He began studying for a masters but did not finish.  He worked with plaintiff Iris Rosario-Méndez at Hewlett Packard in the area of "PHN".  He was a technical supervisor for five years, from 2000 until May 29, 2005.  He was in charge of the third shift by the end of that period, for about a month, or a month and a half, approximately.  At one point plaintiff Iris Rosario-Méndez approached him and told him about a situation which was offensive to her concerning another co-worker on her shift.  She had spoken to her direct supervisor, and made an appointment with Human Resources.  Mr. Rosas contacted Human Resources the next day and brought to them the concern so that it would be on record.  He notified plaintiff that he had done so.  He did not remember the exact date he received the complaint.  When she complained, he supervised the third shift, the shift she was in.

Mr. Rosas noted that plaintiff complained to him about a co-worker, Miguel Rosario.  He noted that she said she had complained to her direct supervisor, José Matías, or Tony Matías, and was looking for support.

AIDA OCASIO CARRERO

Aida Ocasio Carrero testified that she received a degree in Industrial Engineering at University of Puerto Rico, Mayagüez campus in 1987.  She then went to work at Hanes in Camuy for nine years, as engineer and part-time

CIVIL 06-1489 (JAG) (JA)                    37

manager.  She then went to Hewlett Packard where she has worked for 12 years as a process (production) supervisor, and currently works as  an industrial engineer and as a process supervisor.  Ms. Ocasio said that she had to make sure production quotas were met, and to reach the quality control goals expected by the company.  She supervised the first, fourth, and fifth shift in the intermediate assembly area.

Ms. Ocasio stated that she knows Iris Rosario-Méndez and was her supervisor  about three years ago in the first shift.  She was referred at trial to Exhibit M, which she believed to be a letter that she received from Iris Rosario-Méndez, when Ms. Ocasio was in the first shift and Rosario-Méndez had gone up to the third shift.  Ms. Ocasio supervised plaintiff for less than six months. Because of the voluntary separation incentive, the supervisor of the first shift resigned and Ms. Ocasio went to supervise that shift.  Iris Rosario-Méndez told Ms. Ocasio at some point that she was disheartened with the company because she had had a situation with a person (Miguel Rosario) and had filed a complaint of sexual harassment, but the complaint had not been handled the way she expected.  Ms. Ocasio never got another complaint.  She never got a complaint from Iris Rosario-Méndez about Miguel Rosario.  If she had, she would have notified Human Resources.

CIVIL 06-1489 (JAG) (JA)                    38

Ms. Ocasio said that she was not the supervisor when the incidents in question occurred.  When she supervised the shift, she supervised Miguel Rosario on the first shift, and then went to offline supervisor, and when she returned he was no longer on the first shift, because he had applied for voluntary separation incentive.  Miguel Rosario then worked for Selectica, and some of Selectica's operations occurred within Hewlett Packard facilities.

Had Ms. Ocasio got a sexual harassment complaint, she would have immediately reported the complaint to Human Resources.  If a supervisor does not do so, he has violated the sexual harassment policy of the company.  Ms. Ocasio supervised Miguel Rosario on the first shift and Iris Rosario-Méndez on the first shift.  She did not remember when she supervised Miguel Rosario.

BLANCA CRUZ MEDINA

Blanca Cruz Medina testified that she has a B.B.A. awarded in 1984 from the University of Puerto Rico, Mayagüez campus, and is a C.P.A.  She testified that to keep her C.P.A. license, she is required to take 125 to 130 Continuing Education (credits) and a portion of the credits are directed to Human Resources to satisfy Human Resources requirements.  Hewlett Packard requires once-a-year training on the standard of business conduct where a part of the training has to do with Human Resources, and as a supervisor, she has taken training from Hewlett Packard.   She was a supervisor when she began at Hewlett Packard in

CIVIL 06-1489 (JAG) (JA)                    39

2002 for a period of four months, and then for two years on the third shift.  She supervised that shift beginning on September 3, 2005, and has known Iris Rosario-Méndez since the first week of November 2005, when Rosario-Méndez came to work in the third shift.  She identified Exhibit M as the letter Iris Rosario-Méndez gave her during the first week of work that plaintiff used to notify her of a situation, that she has a legal action against the company.  Ms. Cruz said this was the first time she knew of any complaints from Iris Rosario-Méndez.  Plaintiff never complained to Ms. Cruz again about sexual harassment and, as far as Ms. Cruz could recall, plaintiff never complained to her again about Miguel Rosario.  José Matías was a supervisor of the third shift before Ms. Cruz was,  and before Ms. Cruz supervised plaintiff for the first time, she had no knowledge of the case at all.

DAVID TRABAL VÁZQUEZ

David Trabal Vázquez, testified that he has a B.S. in electrical engineering from the University of Puerto Rico, Mayagüez campus, awarded in 1981.  He also has a master's degree from the same institution, awarded in 1991.  He started working for Hewlett Packard as a product engineer, and worked for Hewlett Packard for 28 years.  He has worked as a production engineering manager, new product engineering manager, manufacturing manager, supply chain director, and human resources director, a position that he began in September 2005.  He is

CIVIL 06-1489 (JAG) (JA)                    40

responsible for hiring, record keeping, deployment of policies, workforce planning process, standards of business conduct, and employee relations issues.

Mr. Trabal said he does not know Iris Rosario-Méndez personally but became aware of her in early November 2005. He had no personal knowledge of her complaint until that point. He received a letter from her on the first or second week of November 2005. (Exhibit M.) Ms. Ocasio called him and said she had an issue to discuss with him, indicating the letter. In the letter, Iris Rosario-Méndez expressed concern that she was being transferred back to the third shift, and the person that plaintiff was concerned about was running into her shift because of overtime. Mr. Trabal talked to Aida Ocasio and Blanca Cruz. They did not know anything other than what was in the letter. He talked to Ángel López who told him Iris Rosario-Méndez was complaining of the work environment and of a specific instance when Miguel Rosario had made a gesture to her. Based upon the information Ángel López shared with him, he focused on the environment concern that Iris Rosario-Méndez had expressed to Mr. López. Plaintiff would be on the first shift until October 31, and would subsequently no longer be in the environment because October 31 was the last day of employment for people who had chosen to leave the company under the VSI, and everyone on the third shift had made that election.

CIVIL 06-1489 (JAG) (JA)                    41

Mr. Trabal learned that Miguel Rosario was employed by MSSS, which provided temporary services to Selectica.  Mr. Trabal called Manuel Rodríguez, Human Resources Manager of Selectica, who confirmed the information. Mr. Trabal told Manuel Rodríguez that there was an unacceptable situation and that he needed the person responsible to be assigned to different work with Selectica, one that would not provide for him the opportunity to be in contact with Iris Rosario-Méndez.  Manuel Rodríguez said Miguel Rosario was under contract through MSSS, and Manuel Rodríguez had to contact them.  Mr. Trabal contacted Néctar Morales, Human Resources director of MSSS, and told her of his concerns. Mr. Trabal told Ms. Morales that Miguel Rosario's presence was not acceptable to Hewlett Packard.  Mr. Trabal also told her that it was his prerogative to revoke the privilege that Miguel Rosario be able to enter Hewlett Packard.  On the following day, Manuel Rodríguez called back and said that Miguel Rosario would work at the Selectica building, which is half a mile or a mile from Hewlett Packard.  He would work there through the week, but he might come to the Hewlett Packard facilities on the weekend.

Mr. Trabal stated that Hewlett Packard provides Selectica with its requirements regarding people with a certain level of education.  Hewlett Packard would have no involvement in the selection process of that personnel.

CIVIL 06-1489 (JAG) (JA)                    42

Mr. Trabal  learned that plaintiff chose to go to the first shift to minimize contact with Miguel Rosario.  Mr. Trabal's concern was that she not have contact with Miguel Rosario.  After the transfer, Mr. Trabal did not receive any complaints from Iris Rosario-Méndez.

Mr. Trabal noted that a remedial measure was to transfer plaintiff to the first shift, to have no contact with Miguel Rosario.  Mr. Trabal did not know why Miguel Rosario was working overtime into plaintiff's shift, even though he was not a Hewlett Packard employee.  He did not ask manager Víctor Ujaque or Fernando Pérez, who made the decision to let Miguel Rosario work overtime in the first shift. Mr. Trabal said it was unacceptable for Miguel Rosario to work in the same shift as  Iris Rosario-Méndez.   He testified that Hewlett Packard minimized the possibility of their contact.

## WEIGHT OF THE EVIDENCE

Much of the evidence in this case squarely requires the making of credibility determinations, as there were no witnesses to the bumping incidents that plaintiff testified about, nor to other incidents before those.  Plaintiff's credibility was the focus of the defense.  Indeed, she was impeached on at least a dozen occasions. She related the details of her work environment, her incessant friction with Miguel Rosario, and the extent to which the combination of environment and his actions contributed to her emotional deterioration and rage.  The testimony of witnesses

CIVIL 06-1489 (JAG) (JA)                43

reasonably associated with Hewlett Packard admitted or acknowledged that plaintiff was a superior employee and a team player, one with no complaints against her, and with no attendance issues.  Plaintiff testified that she reported the conduct she found unacceptable in the work environment to management personnel, as did Hewlett Packard management personnel at trial.

> [I]n a hostile work environment claim, the conduct complained of has to be severe or pervasive so as to alter the terms and conditions of employment of a Title VII plaintiff.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754 (1998).  To be actionable under Title VII, the "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. [17,] 21-22 [(1993))].

Crespo Vargas v. United States Gov't, 573 F. Supp. 2d 532, 552 (D.P.R. 2008).

Of particular import is that much of plaintiff's testimony went uncontradicted.  There were no witnesses to the bumping incidents or the other specific incidents which occurred with Miguel Rosario in September and November 2004, and February and March, 2005.

> [A]n employer may be held liable if information of the harassment comes 'to the attention of someone who is reasonably believed to have a duty to pass on the information.'"  Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc., 422 F. Supp. 2d 336, 342 (D.P.R. 2006) (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 403 (1st Cir. 2002)).

CIVIL 06-1489 (JAG) (JA)                    44

Rosario-Méndez v. Hewlett Packard Caribe BV, 573 F. Supp. 2d 558, 561 (D.P.R. 2008).

Hewlett Packard contends that no reasonable jury could have found that plaintiff suffered a hostile work environment because she failed to establish the employer liability prong of a hostile work environment claim, requiring prompt and remedial measures by Hewlett Packard in response to her complaint, and she insufficiently recorded evidence establishing the cited conduct rose to the level of severe or pervasive.[2]   (Docket 143, at 12.)   According to Hewlett Packard, the indisputable evidence of the record reflects that it undertook the legally sufficient actions in response to Rosario-Mendez' claim.  (Id.)  In particular, Hewlett Packard points to plaintiff's March 23, 2005 complaint to her supervisor, Ricardo Rosas, in response to which Hewlett Packard "took prompt and reasonable measures to investigate and respond to the specific act of alleged sexual harassment about which she complained."  (Id. at 13.)  Those measures included "transferring [Mr.

_____

[2]See Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (quoting O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)) (enumerating the prima facie for hostile work environment as: "(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offense, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.").

CIVIL 06-1489 (JAG) (JA)                    45

Rosario] to a different shift, and warning him and threatening termination [sic][.]"

(Id. at 14.)   Additionally, the manager of the intermediate area, Dr. Fernando

Pérez, held a meeting on April 28, 2005 with Rosario-Mendez' entire shift,

discussing the topics of sexual harassment, profane language, and the type of

music played.  (Id. at 17.)   In support of its position, Hewlett Packard cites the

Sixth Circuit case of Blankenship v. Parke, 123 F.3d 868, 871-74 (6th Cir. 1997).

(Id. at 14, 15 & 18.)   It emphatically cites to the following portion of the decision

on page 874: "After the first complaint, Parke took several steps to protect

Blankenship.  Although hindsight shows that these measures may not have been

sufficient, they were appropriate at the time and easily satisfy the 'good faith'

standard we have discussed[.]" (Id. at 15.)   The Sixth Circuit concluded that

"[w]hen an employer implements a remedy, it can be liable for sex discrimination

in violation of Title VII only if that remedy exhibits such indifference as to indicate

an attitude of permissiveness that amounts to discrimination."   Blankenship v.

Parke, 123 F.3d  at 873.  This case is neither convincing nor controlling, and its

abrogation has been recognized down to the proffered quote.  See Collette v.

Stein-Mart, Inc., 126 Fed. Appx. 678, 684 n.3 (6th Cir. 2005) ( overruling a case

citing Blankenship, and noting that  Weigold v. ABC Appliance Co., 105 Fed. Appx.

702, 709-10 (6th Cir. 2004)determined that "an employer may be held liable

when its remedial response is merely negligent, however well-intentioned.")  Nor

CIVIL 06-1489 (JAG) (JA)                    46

can Hewlett Packard find support within this circuit.  See O'Rourke v. City of Providence, 235 F.3d at 729 ("[e]vidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment.").  Furthermore, Hewlett Packard's response to Rosario-Méndez' second complaint, itself coming more than one month after she filed her complaint, can hardly constitute "indisputable" evidence.  This assertion also points to a single instance without consideration of the circumstances leading up to or resulting from the response, when choosing to pat itself on the back for a job well done.  Nor can Hewlett Packard ignore the employee's conduct it describes as an "isolated gesture".  (Docket No. 143, at 25.)  "The accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together, can constitute a hostile work environment."  O'Rourke v. City of Providence, 235 F.3d at 729 (citing Williams v. Gen. Motors Corp., 187 F.3d 553, 563-64 (6th Cir. 1999)).  Rosario-Méndez complained to her immediate supervisor in September of 2004 about the vulgar music and language, as well as the male-on-male shenanigans, to no avail.  This continued unabated until she complained again by writing to the Hewlett Packard production manager for assistance in March of 2005.  The jury was not required to ignore the impact of the intervening six months upon Rosario-Méndez' emotional condition and outlook when examining Hewlett Packard's contribution

CIVIL 06-1489 (JAG) (JA)                    47

to the hostile work environment.  "[A] requirement that a . . . woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living [is] . . . demeaning and disconcerting. . . ."  <u>O'Rourke v. City of Providence</u>, 235 F.3d at 730 (quoting <u>Henson v. City of Dundee</u>, 682 F.2d 897, 902 (11th Cir. 1982)).  There was sufficient evidence at trial on the element of hostile work environment to go to the jury, and the jury could find that the environment was severe and the hostility pervasive.  Of course, the inquiry does not stop there.

Hewlett Packard argues that plaintiff's complaint to Matías in 2004 did not sufficiently put Hewlett Packard on notice to establish employer liability.  "[A]n employer can only be liable if the harassment is causally connected to some negligence on the employer's part.  Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it."  <u>Noviello v. City of Boston</u>, 398 F.3d 76, 95 (1st Cir. 2005) (internal citations omitted).  Hewlett Packard further argues that plaintiff "basically gave Mr. Matías little or no information as to her co-workers' conduct and no information at all regarding the alleged incident that involved Rosario." (Docket No. 143, at 21.) "Ms. Rosario failed to take advantage of the preventive or corrective opportunities afforded to her in [her] communication with Mr. Matías, by refusing to provide information of any incident or employee involved in

CIVIL 06-1489 (JAG) (JA)                    48

harassing conduct, and as such the Faragher-Ellerth defense is applicable." (Id. at 22.)

The Faragher-Ellerth defense does not apply.  This affirmative defense was born of two Supreme Court cases, and permits an employer to avoid liability for a hostile work environment if it shows:  [1] "it 'exercised reasonable care to prevent and correct promptly' the harassment"; and [2] "the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Noviello v. City of Boston, 398 F.3d at 94-95 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)); Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998).  However, the Faragher-Ellerth defense applies only when a sexual harassment charge is leveled at a supervisor, or someone in a supervisory position.  See Noviello v. City of Boston, 398 F.3d at 94 ("The Supreme Court has divided the universe of employer liability along a line that separates supervisors from non-supervisors.").  Plaintiff does not meet this criteria. "When coworkers, rather than supervisors, are responsible for the creation and perpetuation of a hostile work environment," the Noviello court continued, "an employer can only be liable if the harassment is causally connected to some negligence on the employer's part."  Noviello v. City of Boston, 398 F.3d at 95.  "Typically, this involves a showing that the employer knew or should have known about the

CIVIL 06-1489 (JAG) (JA)                    49

harassment, yet failed to take prompt action to stop it." Id. (citing Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002.))

Hewlett Packard argues that Rosario-Méndez effectively failed to file a complaint by not bringing the specific incidences of sexual harassment to Mr. Matías' attention.  Plaintiff argues three major reasons for her omissions:  her initial fruitless conversation with her supervisor, Mr. Matías, her supervisor's close relationship with Mr. Rosario, and the subsequent feelings of degradation and futility.  "While '[t]here is no bright-line rule as to when a failure to file a complaint becomes unreasonable . . . more than ordinary fear or embarrassment is needed.'"  Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 171 (1st Cir. 2009) (quoting Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 35 (1st Cir. 2003)).

Plaintiff stated at trial the nature of the friendship between Mr. Rosario and her supervisor, José Matías, as a reason for not naming Mr. Rosario in her complaint.  This specifically relates to the first time plaintiff complained of a hostile work environment, wherein she cited the degrading music and employee language, as well as the inappropriate banter used by the male employees. Relating closely to this apprehension was her general distrust of Mr. Matías.  The jury could infer that plaintiff doubted Matías' dedication to his position, as illustrated by his sporadic attendance at the plant and, when he did show up, the

CIVIL 06-1489 (JAG) (JA)                    50

brevity of his time there.  This created a dearth of trust in plaintiff that any complaint would result in prompt remedy.  Yet another reason for her failure to file subsequent complaints was the perceived futility of doing so, which stemmed from the decidedly underwhelming response to her first complaint.

"'[T]here are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, but for that reluctance to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do,' specifically, on a 'credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint.'"  Reed v. MBNA Mktg. Sys., Inc., 333 F.3d at 36 (quoting Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999)).  Regarding the reasonableness of plaintiff's first contention, that Mr. Rosario and Mr. Matías' friendship indicated a collusion that created a fear of reprisal or futility, plaintiff failed to provide the court with any evidence of this, except her sincere belief of this being true.  While she established that a friendship existed between the two men, this is not enough to remove her burden of notifying her supervisor of the harassing conduct.  This logic applies equally to her second point, that Matías' work habits did not create an aura of trust and confidence sufficient for her to bring forth her claim.  While plaintiff's beliefs may or may not have been valid, they prove insufficient as a matter of law.  See Reed

CIVIL 06-1489 (JAG) (JA)                    51

v. MBNA Mktg. Sys., Inc., 333 F.3d at 35 (First Circuit acknowledging that the Supreme Court knew that "[r]eporting sexually offensive conduct . . . would . . . be "uncomfortable, scary or both[,]" and despite this, "its regime necessarily requires the employee in normal circumstances to make this painful effort *if the employee wants to impose vicarious liability on the employer and collect damages under Title VII*."

Thus, the tolerability of Ms. Rosario-Méndez' omissions turn on whether she justifiably felt that another report would prove futile as a direct result of her first meeting with Mr. Rosas.  This futility in filing another complaint revolves around the larger negligence requirement that Hewlett Packard knew or should have known that it should have intervened after the first complaint.  See generally Crowley v. L.L. Bean, Inc., 303 F.3d at 401, cited in Noviello v. City of Boston, 398 F.3d at 95.  The question is whether plaintiff presented enough evidence to put her employer on notice that it should have intervened to remedy the hostile work environment, and if so, whether her supervisor's response was of sufficient impotence that plaintiff reasonably felt that any additional report would be futile. Absent such evidence, the conclusion necessarily follows that Hewlett Packard was not effectively put on notice to remedy the claim, and thus could not be held vicariously liable.   See O'Rourke v. City of Providence, 235 F.3d at 736. Conversely, a showing to the contrary would bind Hewlett Packard to the effects

CIVIL 06-1489 (JAG) (JA)                    52

that such futility wrought upon Ms. Rosario-Méndez' condition in the subsequent months.  In any event, this weighing was required by the jury as an intricate part of its traditional duties.

Plaintiff argues that her complaint in September of 2004 certainly should have aroused Mr. Matías' attention enough to warrant addressing the matter. Plaintiff complained of the vulgar language and tasteless activities of the male workers on her shift, as well as the vulgar and explicit music being played. Hewlett Packard countered that nowhere in that complaint does plaintiff specifically address any sexual harassment.  To the contrary, Mr. Matías pointedly asked for the names of the offenders, and plaintiff said that she could not. Plaintiff responds that she presented enough evidence to Mr. Matías, despite not specifically mentioning the perpetrator or the harassing behavior, to induce him to address the complaint.  Thus, the arguments of the parties ultimately are reduced to whether the absence of any alleging sexual behavior is fatal to plaintiff's initial sexual harassment claim.  I find that it is not.

Plaintiff was obviously distraught from the circumstances leading up to the first complaint.  She did not give up Mr. Rosario's name.  She specifically requested a meeting in relation to sexual harassment, since the conduct was inappropriate and because of the lack of respect to fellow workers.  She also

CIVIL 06-1489 (JAG) (JA)                53

specifically mentioned that someone had offended her.  With this information, Matías took no action as a result.

"[U]nless patently futile, concerns as to whether the complaint mechanism will fail can be tested by trying it out if failure is the only cost."  <u>Reed v. MBNA Mktg. Sys., Inc.</u>, 333 F.3d at 36.  Having found that plaintiff's initial complaint provided sufficiently specific evidence of harassing behavior, such that Mr. Matías should have investigated and attempted to remedy the problem, I have to gauge whether, in light of a filed complaint, Mr. Matías' response was sufficiently impotent to justify plaintiff's perception of the futility of bringing another complaint.  It is at this point that plaintiff's first two justifications for her silence, the perceived friendship of Mr. Rosario and Mr. Matías, and the sparse attendance of Mr. Matías, become important again.  Combined with the sole justification from the first element, the failure of her first complaint to effectuate any change, I have to weigh whether the painted picture creates such a claustrophobic veneer of futility from plaintiff's perception that she genuinely had no avenue of recourse.

In light of the facts presented at trial as to effects of Matías' impotent response to her first complaint, the jury could infer that the subsequent failure to report was not unreasonable.  While plaintiff's evidence may not have been overwhelming, it was enough for the jury to resolve the matter in her favor.  Nor can I decide that the jury acted irrationally in resolving the disputed facts in her

CIVIL 06-1489 (JAG) (JA)                    54

favor, concluding that plaintiff endured a hostile work environment that caused her substantial emotional suffering.   Plaintiff admittedly could have been embellishing her trauma to play on the heartstrings of a sympathetic jury; "[b]ut juries are supposed to be good at detecting false claims and at evaluating reasonable behavior in human situations." Reed v. MBNA Mktg. Sys., Inc., 333 F.3d at 37.   Regardless, plaintiff's demeanor and reactions on the witness stand did not have the semblance of histrionic excess.  She reported the work situation to her supervisor as best she could.  She was well aware of the sexual harassment policy of the company.  The company's reaction to her plights was neither as swift nor as effective as it might have been in response to a complaint of this nature from a star employee.  There was enough evidence presented that a reasonable jury could have found as this one did.  The jury could thus reasonably find that Hewlett Packard subjected plaintiff to a sexually hostile work environment, that it failed to effectively act promptly in reaction to plaintiff's sexual harassment complaint, and that it did not provide her with an effective remedy to protect her from a hostile work environment.

COMPENSATORY DAMAGES

Hewlett Packard attacks the amount of the award of $1,500,000 as excessive and clearly against the weight of the evidence.  "Because [defendant] asks us to review a jury award of damages for excessiveness, we must examine

CIVIL 06-1489 (JAG) (JA)                    55

the evidence in the light most favorable to the award, drawing all possible inferences in its favor." Howard v. Feliciano, 583 F. Supp. 2d 252, 258 (D.P.R. 2008) (quoting Smith v. Kmart Corp., 177 F.3d 19, 21 (1st Cir. 1999)). In such a review, "the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur or a new trial on damages only when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it." Howard v. Feliciano, 583 F. Supp. 2d at 258 (quoting Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 245 (1st Cir. 2005)).

A verdict of $1.5 million is difficult to gauge in terms of being high or low and such evaluation involves second-guessing the jury, particularly in a case where no monetary damages or expert testimony was presented. *A fortiori*, "[s]ubstituting the jury's assessment of the damages is limited to extreme situations. '[T]he obstacles which stand in the path of such claims of excessiveness are formidable ones. Translating legal damage into money damages is a matter peculiarly within a jury's ken, especially in cases involving intangible non-economic losses.'" Howard v. Feliciano, 583 F. Supp. 2d at 258 (quoting Smith v. Kmart Corp., 177 F.3d at 30); cf. Franceschi v. Hosp. Gen. San Carlos, Inc., 326 F. Supp. 2d 257 (D.P.R. 2004).

CIVIL 06-1489 (JAG) (JA)                    56

As a result of the incidents with co-worker Miguel Rosario, plaintiff would break down crying.  She was advised to seek mental health treatment and did so at San Juan Capestrano, a known mental health facility.  Somehow, this fact became known by her co-workers.  Plaintiff became reclusive at home and at work, when she had previously been more gregarious.  She would lock herself in her room at home.  She would break down crying and feel asphyxiated.  Her 14 year old daughter would take charge at home as a result of her inability to function.  She would ponder ways to deprive herself of her life and thus conclude her nightmare would stop.  Notwithstanding her complaints, she felt that Hewlett Packard had done nothing.

Despite formidable attacks on plaintiff's credibility, she resulted in being credible to the jury.  Plaintiff was submitted to the bombardment of a sexually perverted work atmosphere which was discontinued for a while but then returned as before.  A jury could infer that Hewlett Packard added to plaintiff's frustration, rage, and emotional deterioration by allowing contact with Miguel Rosario who was allowed overtime in her shift, when Hewlett Packard always had in its authority the power to physically exclude Miguel Rosario from its grounds, something it did not do based upon some ethereal policy which apparently trumped plaintiff's right to be free from harassment in her workplace.  The one certain factor was that Miguel Rosario was the only person who knew how to

CIVIL 06-1489 (JAG) (JA)                    57

operate certain machinery and thus was indispensable to Hewlett Packard. Because Hewlett Packard evidently so valued  this talent, plaintiff sought outpatient treatment in a mental health facility based upon the cumulative effect of the environment and Miguel Rosario's actions, as well as Hewlett Packard's inaction.  The jury did not require expert testimony to make that determination.

When comparing this verdict to others in analogous circumstances, while it may be considered high by the defense, it is not excessive, and does not shock the conscience of the community or the court.  See, e.g., Valentín-Almeyda v. Mun. of Aguadilla, 447 F.3d at 103; Hudson v. Chertoff, 473 F. Supp. 2d 1286, 1291 (S.D. Fla. 2007); cf. Whitfield v. Meléndez-Rivera, 431 F.3d 1, 17 (1st Cir. 2005); Rosado Sostre v. Turabo Testing, Inc., 364 F. Supp. 2d 144, 146-47 (D.P.R. 2005) (Title VII jury verdict after default judgment hearing of $2.5 million, remitted due to statutory cap).  To the contrary, it is a studied reflection of the community's conscience.

PUNITIVE DAMAGES

Hewlett Packard stresses that the court committed error by instructing the jury regarding punitive damages, and sustaining the award of $500,000.  Under federal law, "punitive damages in discrimination cases are authorized 'in only a subset of cases involving intentional discrimination.'"  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 41 (1st Cir. 2003) (quoting Kolstad v. Am. Dental Ass'n, 527

CIVIL 06-1489 (JAG) (JA)                 58

U.S. 526, 534 (1999)).  To establish a basis for punitive damages, the plaintiff must, in addition to proving intentional discrimination, "show[ ] that the employer acted with malice or reckless indifference to federally protected rights." McDonough v. City of Quincy, 452 F.3d 8, 23 (1st Cir. 2006). This formulation means that the employer must have "at least discriminate[d] in the face of a perceived risk that its actions [would] violate federal law. . . . " Kolstad v. Am. Dental Ass'n, 527 U.S. at 536; see also McDonough v. City of Quincy, 452 F.3d at 24 ("[M]alice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law."); Tobin v. Liberty Mut. Ins. Co., 553 F.3d at 148; cf. Méndez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 48 (1st Cir. 2009).

Reviewing the evidence, I cannot determine that a reasonable jury could charge Hewlett Packard with malice or reckless indifference toward plaintiff's constitutional rights.  What Hewlett Packard perceived as a remedy, that is, taking away privileges from Miguel Rosario that he was not apt to request on the eve of departure, and warning him that another transgression would result in immediate discharge does not reflect malice or reckless indifference.  To the contrary, Hewlett Packard clearly had a well-defined sexual harassment policy clearly published for all to see and its management, albeit short-sighted, attempted a remedy of sorts.  In plaintiff's view, as stressed over and over again by counsel

CIVIL 06-1489 (JAG) (JA)                    59

on closing argument, Hewlett Packard did nothing.  Had that been true, the punitive damages award would stand.  However, the meeting called by the production manager, the investigation, the counseling of Miguel Rosario, the shift switchings, the abortive attempts to isolate plaintiff from further harm do not support the conclusion that Hewlett Packard knew it was risking violating federal law.  The general insensitivity to the circumstances simply does not translate into an award of punitive damages.  See Tobin v. Liberty Mut. Ins. Co., 553 F.3d at 149.

In view of the above, the motion for judgment as a matter of law, for new trial, seeking to alter judgment and for remitittur is denied.  The motion seeking elimination of the award of punitive damages is granted and in that respect only, the jury verdict is vacated in part.

SO ORDERED.

At San Juan, Puerto Rico, this 30th day of July, 2009.

S/ JUSTO ARENAS
Chief United States Magistrate Judge